UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DELORES WILLIAMS,

                    Plaintiff,

        -against-                                    CIVIL ACTION NO.: 18 Civ. 01398 (SLC)

ANNE GEIGER and DEPARTMENT OF EDUCATION,              **OPINION & ORDER**

                    Defendants.

**SARAH L. CAVE,** United States Magistrate Judge.

## I.INTRODUCTION

Delores Williams filed this action against her former employer, the Department of Education of the City of New York ( the "Department") and Anne Geiger ("Geiger") (the Department and Geiger together, "Defendants"), the Principal of the High School of Arts and Technology (the "High School"), which is the school operated by the Department where Williams formerly worked. Williams alleges that the Department failed to provide her with reasonable accommodations for her disability, and, because of her disability, subjected her to a hostile work environment and then constructively discharged her, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq. (ECF No. 47 ¶¶ 24–66). Williams alleges that Geiger is liable under the NYSHRL and NYCHRL as an aider and abettor of the Department's violations. (Id. ¶¶ 67–80).

Before the Court is the Defendants' motion for summary judgment as to all of Williams's claims (the "Motion"). (ECF No. 51). Defendants argue that they provided Williams a reasonable

accommodation for her disability, and she has failed to show any discrimination, adverse action, or hostile work environment. (ECF No. 53). Defendants also argue that Williams's claims under the NYSHRL and NYCHRL fail because she did not file a timely notice of claim. (ECF No. 53 at 9–10). For the reasons set forth below, Defendants' motion is granted as to all of Williams's claims against the Department, and her NYSHRL and NYSHRL claims against Geiger are dismissed without prejudice.

## II.BACKGROUND

### A. Factual Background

The following facts are taken from the evidence submitted in support of and in opposition to the Motion, and are undisputed unless otherwise noted.

#### 1. The High School of Arts and Technology

From 2002 until 2018, Geiger was the Founding Principal of the High School, located on the third floor of 122 Amsterdam Avenue in New York City. (ECF No. 66 ¶¶ 1, 4). The High School is located within the Martin Luther King Jr. educational campus and shares a facility with two other schools operated by the Department. (Id. ¶ 3). Within the High School, the hallways form an exterior border around all administrative offices and classrooms, both of which are on the interior and do not have windows. (Id. ¶ 5).

In 1997, Williams began working for the Department as a school aide. (Id. ¶ 6). In 2010, Williams was diagnosed with anxiety disorder, for which she has undergone treatment continuously. (Id. ¶ 70). In 2012, Williams began working at the High School as a school aide. (Id. ¶ 7). Assistant Principal Tesfa Stewart was Williams's immediate supervisor. (Id. ¶ 8). In general, school aides perform a variety of assignments within the Department's schools, including assisting with students, assisting in the cafeteria, and providing administrative

assistance. (Id. ¶ 9). During her first two years as a school aide at the High School, Williams was assigned to the main office, where she collected and reviewed daily attendance records. (Id. ¶ 10). In her third year at the High School, Williams began a three-year assignment in the records department, where she responded to alumni requests for transcripts. (Id. ¶ 11). When she began her assignment in the records department, it was located toward the back of the second floor of the building in which the High School was located. (Id. ¶ 12). While assigned to the records department, Williams's work schedule was from 9:30 a.m. to 1:30 p.m. (ECF No. 54-1 ¶ 12).

In September 2015, before the start of the 2015–2016 school year, the records department moved to the sub-basement of the same building. (ECF No. 66 ¶ 13). On October 13, 2015, while working in the newly-located sub-basement records room, Williams suffered a panic attack, for which she received treatment in the emergency room at Mount Sinai Medical Center. (ECF No. 66 ¶ 14). Williams believed that Geiger moved the records room to the basement "just to spite [her]." (ECF No. 54-2 at 35).

### 2. Williams's reasonable accommodations

On October 5, 2015, the week before her panic attack, Williams had submitted an accommodation request to the Department, stating that she was unable to work in the sub-basement because of her major depressive disorder, anxiety disorder, panic attacks, claustrophobia, heart arrhythmia, and asthma. (ECF No. 66 ¶¶ 15–16). In support of her request for an accommodation, Williams submitted a letter from Dr. Laura Fizel explaining that placing her in windowless, confined spaces could exacerbate her generalized anxiety disorder and major

depressive disorder.  (Id. ¶ 17).  Williams was afraid that Geiger "was going to send [her] into a

heart attack," and "would come after [her], just to rouse up that disability."  (ECF No. 60-1 at 14).

After reviewing Williams's request, the Department's Office of Medical, Leaves, and

Records Administration determined that an accommodation "not to be placed in a confined,

windowless space for an extended period of time" was medically warranted.  (ECF No. 66 ¶ 18;

ECF No. 54-8).  Geiger met with the Department's Disability Coordinator, William Brewton, to

discuss alternative assignments to accommodate Williams's disability.  (ECF No. 66 ¶ 19; ECF No.

54-9).  Geiger and Stewart then met with Williams to suggest limiting her time in the record room,

but Williams asked to be removed completely from the records room.  (ECF No. 54-10).  In a letter

dated October 23, 2015, Geiger informed Williams that her requested accommodation had been

granted, and starting October 26, 2015, she would be assigned to assist students with uniforms

at the beginning of the school day in the cafeteria, followed by assisting staff at the main entrance

with late-arriving students, with a set work-day of 8 a.m. to 12:00 p.m. (Id.; ECF No. 66 ¶ 21).  In

a letter dated October 27, 2015, the Department's Office of Medical, Leaves, and Records

Administration notified Williams that her request for an accommodation had been granted.  (ECF

No. 66 ¶ 22; ECF No. 54-11).

On February 5, 2016, Stewart informed Williams that there would be a change to her work

assignments that would require her to work afternoon hours.  (ECF No. 54-2 at 26; ECF No 54-12

at 2).  On February 5, 2016, Williams wrote to Geiger requesting that her work schedule not

change because having to work afternoon hours interfered with her childcare responsibilities for

her grandchildren.  (ECF No. 54-12; ECF No. 66 ¶ 25).  In response to Williams's request, Stewart

did not change her hours for the remainder of the 2015–2016 school year.  (ECF No. 54-2 at 27–

28; ECF No. 66 ¶ 26).  At some point during the 2015–2016 school year, Williams recalled that Geiger initiated a fire drill by yelling "fire drill," when there were no alarm lights flashing, and criticized Williams for holding the door open for other staff.  (ECF No. 60-1 at 15–16).   In May 2016, Geiger learned that Williams was undergoing treatment for anxiety, for which she exhibited symptoms that included panic attacks.  (ECF No. 66 ¶¶ 71–74).

During the 2016–2017 school year, Geiger attested, the High School no longer required a school aide to assist with late-arriving students in the mornings, so Stewart assigned Williams to provide administrative assistance to two guidance counselors.  (ECF No. 66 ¶ 27; ECF No. 54-1 ¶¶ 18–19; ECF No. 54-2 at 20).  When assistance was needed for the Individualized Education Plans ("IEP") coordinator and the staff completing cell phone distribution, Geiger and Stewart examined the school aide schedules and considered Williams's granted accommodation to ensure that her new assignments did not place her in a confined, windowless space for an extended period of time.  (ECF No. 54-1 ¶¶ 20–21).

On December 13, 2016, Williams received in her school mailbox a notice of her new assignments and work schedule.  (ECF No. 54-13).  Stewart also verbally informed Williams of the change.  (ECF No. 66 ¶ 34).  The schedule involved her working in the IEP room starting at 11:00 a.m., in a lunch room at 12:00 p.m., at the boys' bathroom/parent pickup at 12:45 p.m., and assisting with cellphones from 2:17 p.m. to 3:00 p.m.  (ECF No. 54-13; ECF No. 66 ¶ 31).  The IEP room is comprised of one large interior office and, next to the windowed hallway, a smaller exterior office, where Williams was to work for less than one hour.  (ECF No. 54-1 ¶ 25).  During bathroom monitoring and parent pickup, Williams was to be located in the windowed hallway.  (Id. ¶ 26).  For lunch duty and distributing cellphones, Williams was to be located in a large space

for less than one hour each.  (Id. ¶ 27).  Geiger believed that each of these assignments was appropriate for Williams's granted accommodation because they did not place her in any confined space for an extended period of time, (id. ¶ 24), and were consistent with duties assigned to other school aides.  (ECF No. 66 ¶ 33; ECF No. 54-4 at 2).

In response to the news of the schedule change, Williams wrote a letter to Geiger, copying Stewart, asking that her work hours not be changed and citing her "family responsibilities" in the afternoons.  (ECF No. 66 ¶ 34; ECF No. 54-14).  Williams believed that the schedule change violated her disability accommodation.  (ECF No. 66 ¶ 35).  On December 16, 2016, the High School secretary attempted to provide Williams a copy of her new schedule and assignments, but she refused to take the document.  (ECF No. 54-13 at 2).

### 3.  Events on December 19, 2016

At 8:00 a.m. on December 19, 2016, on learning that Williams was present in the High School, Geiger asked a staff member to request Williams come to Geiger's office so that Geiger could provide her the new schedule and assignments.  (ECF No. 54-1 ¶ 30).  When Williams arrived at Geiger's office, Geiger informed her of the new schedule, and reminded her that, because her assignments did not start until 11:00 a.m., she should not be at the High School before that time.  (ECF No. 54-1 ¶ 31; ECF No. 54-2 at 5–6; ECF No. 66 ¶ 38).  Geiger attested that Williams became "irate," and refused to sign or accept the new schedule and assignments.  (ECF No. 54-1 ¶ 31; see ECF No. 54-13 at 2).

Williams acknowledged that she had been told about the new schedule, but claimed that she did not receive a copy of the schedule until she met that morning with Geiger, who then angrily told her to leave the High School and "come back at 11 o'clock."  (ECF No. 54-2 at 5; ECF

No. 66 ¶ 40; ECF No. 60-1 at 11). Williams protested the schedule change, pointing to the accommodation that she believed set her schedule at 8:00 a.m. to 12:00 p.m., and arguing that neither Geiger nor anyone else could change it without Department approval. (ECF No. 54-2 at 6–7). Williams returned to the guidance office to collect her belongings, and began explaining to her co-workers her concerns about not being able to pick up her grandchildren. (ECF No. 54-2 at 6–7; ECF No. 66 ¶ 40). Williams testified that at that moment, Geiger walked into the guidance office and told her, "Get your stuff and go with me." (ECF No. 54-2 at 7). Williams became nervous, and felt chest pain and shortness of breath. (ECF No. 54-2 at 7). Williams testified that a guidance counselor told her to sit down and told Geiger to "leave her alone. You see she['s] nervous." (ECF No. 60-1 at 13). Geiger asked Williams if she needed an ambulance, and after Williams said she did, Geiger called for the building manager, Mr. Abassi, to come to the guidance office. (ECF No. 54-2 at 7). Mr. Abassi called for an ambulance. (ECF No. 66 ¶ 43). Although Williams testified that she then "blanked-out," (ECF No. 60-1 at 13), she claimed that she heard the guidance counselor tell Geiger to stop yelling at Williams, (ECF No. 60-1 at 8), and that one of the EMS personnel told her that Geiger was a "bully" and Williams would be "safe" with him. (ECF No. 60-1 at 9).

Geiger disputes that she followed Williams to the guidance office; she testified instead that she and Assistant Principal Benny Urena heard over their walkie-talkies that there was an emergency in the guidance office, and Urena arrived in that office before Geiger. (ECF No. 54-1 ¶ 34; ECF No. 54-16). Urena also testified that he arrived in the guidance office, where he observed Williams in physical distress, before Geiger, who did not arrive until the ambulance and police officers arrived. (ECF No. 54-15 at 6). Urena testified that when Geiger did arrive, Williams

began yelling, "move her out of here, she hates me, get her out of here."  (ECF No. 54-15 at 6).

At the request of EMS personnel, Geiger and Urena moved out of the guidance office and into

the hallway.  (ECF No. 66 ¶ 47).

EMS personnel took Williams via ambulance to a nearby hospital, from which she was

discharged the same day.  (ECF No. 66 ¶ 48).

### 4.  Events after December 19, 2016

On January 4, 2017, Williams applied for a leave of restoration of health for the period of

December 20, 2016 through February 13, 2017, and Geiger granted her request.  (ECF No. 66

¶ 49).  On February 6, 2017, Williams rescinded that leave request, and submitted a new request

for the period of December 20, 2016 through March 26, 2017, which Geiger also granted.  (ECF

No. 66 ¶¶ 50–51).  Once her leave expired, Williams did not return to work or respond to Geiger's

calls.  (ECF No. 66 ¶ 52; ECF No. 54-20 at 2).  Williams testified that she retired from the

Department on June 26, 2017 because, "[a]fter what happened" she "was unable to work" there

anymore.  (ECF No. 60-1 at 10).

### 5.  Williams's OEO Complaint

On October 16, 2015, Williams called Disability Coordinator William Brewton to make an

informal complaint arising from her panic attack in the records room.  (ECF No. 54-9 at 2).

Following the call, Brewton emailed the complaint form to Williams, who completed and filed

the complaint form with the Department's Office of Equal Opportunity & Diversity Management

("OEO").  (ECF No. 54-22 at 3).  Williams alleged in the complaint form (the "OEO Complaint")

that Geiger and Stewart discriminated against her based on her age and disability by making her

work in the basement despite her written request for an accommodation.  (ECF No. 54-22 at 3).

At the time of Williams's OEO Complaint, Geiger was working with Brewton to adapt Williams's duties to the accommodation she had been granted. (ECF No. 54-9 at 2).

The OEO reviewed Williams's complaint and determined that Geiger and Brewton's efforts mooted her complaint regarding her accommodation, and because her other allegations fell outside the OEO's jurisdiction, referred them to the Superintendent, Fred Walsh, and closed her complaint. (ECF Nos. 54-23; 54-24).

### 6. **Williams's EEOC Complaint**

On February 27, 2017, Williams filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights (the "EEOC Complaint"). (ECF Nos. 66 ¶ 58; 54-25). Williams alleged that Geiger discriminated against and harassed her based her disability by changing her work schedule and harassing her on December 19, 2016. (ECF Nos. 66 ¶ 58; 54-25). The Department submitted a lengthy position statement rebutting Williams's EEOC Complaint. (ECF Nos. 66 ¶ 59; 54-26). Based on its investigation, the EEOC was unable to conclude that the Department violated any relevant statutes, and, on November 30, 2017, issued to Williams a dismissal and notice of rights. (ECF Nos. 66 ¶ 60; 54-27 at 2).

### 7. **Williams's notice of claim**

On June 11, 2018, Williams filed a notice of claim with the City's Office of the Comptroller, alleging that on December 19, 2016, Geiger removed Williams's disability accommodation, instilled in her a fear of physical violence and directed another employee to put Williams in fear of her physical safety, while knowing that her anxiety disorder would force her to have to leave the High School. (ECF No. 54-28 at 7–8).

## B. Procedural Background

On February 15, 2018, Williams filed her Complaint in this action (ECF No. 2), on June 19, 2018, filed a First Amended Complaint (ECF No. 22), and on May 6, 2019, filed a Second Amended Complaint (ECF No. 47). On May 20, 2019, Defendants filed an Answer to the Second Amended Complaint. (ECF No. 48).

## III. DISCUSSION

### A. Legal Standards

#### 1. Motions for summary judgment

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Darnell v. Pineiro, 849 F.3d 17, 22 (2d Cir. 2017); Byrd v. City of New York, No. 17 Civ. 2166 (AJP), 2018 WL 259316, at *3 (S.D.N.Y. Jan. 2, 2018). "On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists," and if the movant satisfies that burden, "the burden shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial,' . . . and to present such evidence that would allow a jury to find in his favor." Blue v. City of New York, No. 14 Civ. 7836 (VSB), 2018 WL 1136613, at *5 (S.D.N.Y. Mar. 1, 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

To overcome a summary judgment motion, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Blue, 2018 WL 1136613, at *5 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986)).  The nonmoving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed."  Fed. R. Civ. P. 56(c)(1); see Blue, 2018 WL 1136613, at *5; Byrd, 2018 WL 259316, at *3.  Where a party "fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," inter alia, "consider the fact undisputed for purposes of the motion," or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3); see Blue, 2018 WL 1136613, at *5.

Presented with a motion for summary judgment, the Court does not resolve contested issues of facts, but rather determines whether any disputed issue of material fact exists.  See Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Byrd, 2018 WL 259316, at *5.  The applicable substantive law determines which facts are material "and which facts are irrelevant."  Byrd, 2018 WL 259316, at *5.  The Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."  Allen v. Coughlin III, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations omitted); see Rasmy v. Marriott Int'l, Inc., No. 18-3260 Civ., 2020 WL 1069441, at *4 (2d Cir. Mar. 6, 2020) (explaining that a "district court must resolve any doubts and ambiguities and draw all reasonable inferences in favor of the nonmoving party").  Wandering Dago v. Destito, 879 F.3d 20, 30 (2d Cir. 2018); Vasquez v. Reilly, No. 15 Civ. 9528 (KMK), 2018 WL 2768648, at *1 (S.D.N.Y. June 8, 2018).

Summary judgment must be denied "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002); see Byrd, 2018 WL 259316, at *4 ("If, as to the issue on which

summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.").  "In determining whether the moving party is entitled to judgment as a matter of law, or whether instead there is sufficient evidence in the opposing party's favor to create a genuine issue of material fact to be tried, the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010).

### 2.  Legal standards under the ADA

The purpose of the ADA is to "provide a comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(2).  The ADA thus makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to," inter alia, "discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

### a.  Definition of disability

To maintain her claims under the ADA, Williams must first establish that she was disabled within the meaning of the statute, i.e., that she has an actual disability, which is defined as "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A), has a record of such an impairment, 42 U.S.C. § 12102(1)(B), or is "regarded as" disabled.  42 U.S.C. § 12102(1)(C).

"Major life activities" are those "that are of central importance to daily life." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002) (superseded by statute on other grounds, ADA Amendments Act of 2008, Pub.L. 110-325, 122 Stat. 3553); see Wade v N.Y.C. Dep't of Educ., No. 11 Civ. 05278 (LGS), 2014 WL 941754, at * 11 (S.D.N.Y. Mar. 10, 2014). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, . . . standing, lifting, bending, . . . and working." 42 U.S.C § 12102(2)(A). To determine whether an impairment "substantially limits" a major life activity, a court may consider, inter alia, "the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." Capobianco v. City of New York, 422 F.3d 47, 57 (2d Cir. 2005) (citations omitted). Courts construe the "substantial limitation" standard broadly "in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA" and it "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

To receive protection under the ADA, the plaintiff must be otherwise qualified for the position—she must be "an individual who, with or without reasonable accommodation, can perform the essential functions of [the position]." 42 U.S.C. § 12111(8). In other words, someone who cannot perform the "essential functions" of her job "even with reasonable accommodations is not protected by the ADA in the employment context." Hernandez v. City of New York, No. 11 Civ. 6644 (KPF) (DF), 2015 WL 321830, at *16 (S.D.N.Y. Jan. 23, 2015).

### 3. Reasonable accommodation claim

The ADA requires an employer to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," and the failure to do so constitutes impermissible discrimination.

42 U.S.C. § 12112(b)(5)(A).  This requirement only applies to persons with an actual, as opposed to a perceived, disability.  42 U.S.C. § 12201(h).  To make a <u>prima</u> <u>facie</u> showing of a failure to provide reasonable accommodation under the McDonnell-Douglas burden shifting framework applicable to employment discrimination claims,[1] a plaintiff must prove that (1) she is a person with a disability under the meaning of the statute; (2) an employer covered by the statute had notice of her disability; (3) with reasonable accommodations she could perform the essential functions of the job at issue (<u>i.e.</u>, she is a "qualified individual"); and (4) the employer refused to make such accommodations.  <u>Graves v. Finch Pruyn & Co.</u>, 457 F.3d 181, 184 (2d Cir. 2006) ("<u>Graves  I</u>").   An  employer  may  avoid  liability  by  demonstrating  that  the  requested accommodation would impose "an undue hardship on the operation of [its] business."  42 U.S.C. § 12112(b)(5)(A); <u>see</u> <u>Graves I</u>, 457 F.3d at 184.  While "[i]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits," <u>Borkowski v. Valley Central School District</u>, 63 F.3d 131, 138 (2d Cir. 1995), an ADA plaintiff complaining that her employer failed to provide a transfer to a new position as a reasonable  accommodation  still  "bears  both  the  burden  of  production  and  the  burden  of persuasion on the question whether a suitable vacancy existed at the time [s]he sought transfer." <u>Jackan v. N.Y. State Dep't of Labor</u>, 205 F.3d 562, 567 (2d Cir. 2000).

The Second Circuit has explained that "[t]he duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover," <u>Parker v. Columbia Pictures Industries</u>, 204 F.3d 326,

---

[1] <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 83 (2d Cir. 2015); <u>Concepcion v. City of New York</u>, No. 15 Civ. 2156 (AJP) 2016 WL 386099, at *7 (S.D.N.Y. Jan. 29, 2016).

338 (2d Cir. 2000), and has "never expressly held that leaves of absence from an employee's job, taken in order to recover from a disability, are 'reasonable accommodations' under the ADA." Graves v. Finch Pruyn & Co., 353 F. App'x 558, 560 (2d Cir. 2009) ("Graves II").

### 4. **Hostile work environment claim**

The Second Circuit recently held that hostile work environment claims are cognizable under the ADA. See Fox v. Costco Wholesale Corp., 918 F.3d 65, 73–74 (2d Cir. 2019); Harvin v. Manhattan and Bronx Surface Transit Operating Auth., 767 F. App'x 123, 128 (2d Cir. 2019) (concluding that "hostile work environment claims are cognizable under the ADA" applying "the standards applicable to claims under Title VII of the Civil Rights Act") (citing Fox, 918 F.3d at 74); Viruet v. City of New York, No. 16 Civ. 8327 (JGK), 2019 WL 1979325, at *17 (S.D.N.Y. May 3, 2019) ("In the recent case Fox v. Costco Wholesale Corp., the court determined that [hostile work environment] claims can be asserted under the ADA"). Accordingly, "the standards applicable to claims under Title VII of the Civil Rights Act" of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., are applicable to hostile work environment claims based on disability. Harvin, 767 F. App'x at 128.

An employer violates Title VII when the "workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . so long as there is a basis for imputing the conduct that created the hostile environment to the employer." Rasmy, 2020 WL 1069441, at *4 (quoting Kaytor, 609 F.3d at 546) (emphasis and internal citations omitted). To establish a hostile work environment claim, a plaintiff must show that (i) "the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of . . . her work environment," and (ii) the harassment was based

on her protected group.  Harvin, 767 F. App'x at 128 (quoting Petrosino v. Bell Atl., 385 F.3d 210, 221–22 (2d Cir. 2004)); see Hernandez, 2015 WL 321830, at *17.  To assess whether a plaintiff has met this burden, a district court must consider "the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance."  Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014); see Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) (liability for a hostile work environment is "determined only by looking at all the circumstances").  This assessment has both "objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  Rivera, 743 F.3d at 20) (internal citations omitted).

"A mild, isolated incident does not make a work environment hostile[.]  [T]he test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse."  Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (internal citations omitted).  Similarly, "[r]un-of-the-mill workplace conflicts, troubling though they may be, do not rise to the level of an objectively hostile workplace."  Harvin, 767 F. App'x at 128 (finding that incidents where plaintiff's supervisors were "rude and hostile" reflected "only fraught relationships with her supervisors" that did not rise to level of hostile work environment); see Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (holding that "the ordinary tribulations of the workplace, such as the sporadic use of abusive language," do

not rise to a level constituting a hostile work environment); Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999) ("Isolated, minor acts or occasional episodes do not warrant relief.")

### 5. Termination Claim

The ADA prohibits an employer from discharging an employee because of her disability. 42 U.S.C. § 12112(a).  To establish a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that:  "(1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation [i.e., that she is a 'qualified individual' under the statute]; and (4) she was fired because of her disability."  Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869–70 (2d Cir. 1998).

A termination "may consist of either the employer's actual termination of the plaintiff's employment or the existence of intolerable conditions, attributable to the employer, amounting to a 'constructive' discharge."  Green v. Town of East Haven, No. 18-0143, 2020 WL 1146687, at *8 (2d Cir. Mar. 10, 2020); see Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 161 (2d Cir. 1998); see also Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993).  If the discharge is "constructive, the alterations, to be actionable, 'must be severe or pervasive.'"  Green, 2020 WL 1146687, at *8 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752 (1998)); see Harris, 510 U.S. at 22 ("A discriminatorily abusive work environment . . . can . . . discourage employees from remaining on the job.").  To establish a constructive discharge, a plaintiff may establish that her "employer, rather than acting directly, deliberately mad[e her] working conditions so intolerable that [she was] forced into an involuntary resignation."  Kirsch, 148 F.3d at 161.  The "intolerable condition

may be shown by evidence that the employer gave the plaintiff the choice of resigning or being fired." Green, 2020 WL 1146687, at *8.

A constructive discharge cannot be shown, however, "simply by the fact that the employee was unhappy with the nature of her assignments or criticism of her work, or where the employee found the working conditions merely 'difficult or unpleasant.'" Id. (quoting Green v. East New Haven Police Dep't, No. 16 Civ. 321 (VLB), 2017 WL 6498144, at *7 (D. Conn. Dec. 19, 2017)). Instead, the standard for assessing whether the alterations have become intolerable is an objective one:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.

Green, 2020 WL 1146687, at *8. (quoting Harris, 510 U.S. at 21).

At the summary judgment stage, the burden a plaintiff must meet is "not onerous" and has been described as de minimis. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). A plaintiff makes a prima facie showing of constructive discharge "if she adduces evidence from which a rational juror could infer that the employer made her working condition, viewed as a whole, 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" Green, 2020 WL 1146687, at *8 (quoting Kirsch, 148 F.3d at 161). Once the plaintiff has made this prima facie showing, the burden shifts to the employer to rebut the presumption of discrimination "by articulating a legitimate, nondiscriminatory reason for its actions." Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999). Plaintiff must sustain the ultimate burden of persuasion "that the defendant intentionally discriminated against" her. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

In evaluating constructive discharge claims at the summary judgment stage, the Second Circuit recently cautioned that "the determination of whether it was objectively reasonable for an employee to feel compelled to resign in order to avoid being fired requires at least an examination of the information possessed by the employee," and "[i]f any relevant facts are in dispute or subject to competing inferences as to their effects, or if there is admissible evidence from which a rational juror could infer that a reasonable employee would have felt so compelled, rejection of the constructive-discharge theory as a matter of law is impermissible." Green, 2020 WL 1146687, at *8 (reversing grant of summary judgment for defendants).

**B.  Analysis of Williams's ADA Claims**

It is undisputed for purposes of Defendants' motion for summary judgment that Williams is disabled.  (ECF No. 53 at 12).  The Court will therefore analyze the remaining elements of each of Williams's claims.

**1.  Reasonable accommodation claim**

The Department's liability with respect to Williams's reasonable accommodation claim under the ADA turns on the fourth element, whether the Department refused to make reasonable accommodations such that Williams could perform the essential functions of her job. See Graves I, 457 F.3d at 184.  (See ECF Nos. 53 at 13–14; 59 at 5–7).  Williams claims that the change in work assignment and work schedule the Department implemented in December 2016 failed to provide a reasonable accommodation for her disability in violation of the ADA.  (ECF No. 66 ¶ 35).

Defendants argue that the hours Williams was scheduled to work at the High School were, as a matter of law, irrelevant to her accommodation, which was based on her inability to work in

a confined, windowless space for an extended period of time, and did not involve a disability that prevented her from working certain hours. (ECF No. 53) (citing Ugactz v. UPS, Inc., No. 10 Civ. 1247 (MKB), 2013 WL 1232355, at *12 (E.D.N.Y. Mar. 26, 2013)). Defendants argue that it was incumbent on Williams to initiate an administrative review or file a grievance, rather than "ignor[ing] the reassignment" as she did and then taking a medical leave of absence until her application for disability retirement was approved. (ECF No. 53 at 14).

Williams concedes that the problem with the schedule change was the "adverse impact [on] her child caring responsibilities," but argues that the Department failed to give her notice of the schedule change and failed to engage with her in the "interactive process" required by the ADA. (ECF No. 59 at 4–5).

Although "[t]he reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder," see Noll v. IBM, 787 F.3d 89, 94 (2d Cir. 2015) (quoting Wernick v. Fed. Reserve Bank of N.Y., 91 F.3d 379, 385 (2d Cir. 1996)), in a case such as this where "the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" Noll, 787 F.3d at 94 (quoting Wernick, 91 F.3d at 385); see Concepcion, 2016 WL 386099, at *16 (granting summary judgment where plaintiff presented no evidence to show that accommodations were insufficient). That is to say, "the plain reasonableness of the existing accommodation ends the analysis," without the "need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been reasonable." Noll, 787 F.3d at 94.

The Court finds that Williams has failed to raise any genuine issue of material fact with respect to the reasonable accommodation the Department granted in October 2015. <u>See</u> <u>Id.</u> at 95 (affirming summary judgment where record established that employer had provided plaintiff "with several accommodations"). The only issue that Williams's treating physician raised in support of her request for a reasonable accommodation was her need, due to her anxiety disorders, to avoid working in windowless, confined spaces. (ECF No. 66 ¶ 17; ECF No. 54-7 at 2). Williams does not dispute that the Department granted her the precise accommodation she requested, (ECF No. 66 ¶ 18; ECF No. 54-8 at 2), and that <u>none</u> of the assignments she was given thereafter were located "in a confined windowless space for an extended period of time." (ECF No. 66 ¶¶ 21–22, 26–27, 31, 34). Accordingly, she has failed to demonstrate a genuine question of material fact whether the accommodations the Department provided starting in October 2015 were reasonable. <u>See</u> <u>Concepcion</u>, 2016 WL 386099, at *16–17) (granting summary judgment where undisputed facts showed that accommodations were reasonable).

To the extent that Williams argues that, in December 2016, the Department changed her schedule without cooperating or engaging in an interactive process to identify a reasonable accommodation, the Court also finds that Williams fails to raise any genuine issue of material fact. <u>See</u> <u>Williams v. N.Y. State Dep't of Labor</u>, No. 98 Civ. 3816 (RMB), 2000 WL 33175735, at *20 (S.D.N.Y. May 25, 2000) (granting summary judgment for defendants on reasonable accommodation claim). The process to which Williams refers is contemplated by the ADA regulations, which provide that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). The Second

Circuit has explained that "[t]he ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can reasonably be accommodated." Jackan, 205 F.3d at 566 (citing 29 C.F.R. § 1630.2(o)(3)).  Nevertheless, the "failure to engage in an interactive process does not form the basis of an ADA claim in the absence of evidence that accommodation was possible McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 100 (2d Cir. 2009).  Thus, "the ADA imposes no liability for an employer's failure to explore alternative accommodations when the accommodations provided to the employee were plainly reasonable." Noll, 787 F.3d at 98.  "[T]he interactive process is not required when the end it is designed to serve—reasonable accommodation—has already been achieved." Id.

As set forth above, the Department provided a reasonable accommodation to Williams, not once, but three times; it is undisputed that each assignment she was given complied with the requirement that she "not [] be placed in a confined, windowless space for [an] extended period of time."  (ECF Nos. 66 ¶ 18; 54-8 at 2).  Thus, no further interactive process was required.  See Noll, 787 F.3d at 98.

The issue Williams takes with her final assignment is not with the location, but rather with the hours, which bore no relation to the accommodation she requested and was granted.  Cf. Scalera v. Electrograph Sys., Inc., 848 F. Supp. 2d 352, 367 (E.D.N.Y. 2012) ("there must be some sort of causal connection between the Plaintiff's disability and the requested accommodation").  The objection she had to the new assignment was not based on her disability, but rather on her childcare responsibilities.  (ECF No. 66 ¶ 34; ECF No. 54-14 at 2).  By her own admission, then, the schedule change did not have any impact on her disability.  Furthermore, Williams does not dispute that, after December 2016, she requested, and Geiger granted, her requests for leave for

restoration of health, (ECF No. 66 ¶¶ 49–51), she neither returned to work nor answered calls from Geiger (ECF No. 66 ¶ 52), and she sought and received disability retirement in June 2017. (ECF No. 66 ¶ 53). Despite having availed herself—successfully—of the Department's disability accommodation process once before (ECF No. 66 ¶¶ 15–18), she provides no reason why she did not do so in December 2016, and she does not point to any accommodation that she requested but was denied. It is thus by her own choice that the interactive process did not recommence, which precludes her ability to recover. See Nugent v. St. Lukes-Roosevelt Hosp. Ctr., 303 F. App'x 943, 946 (2d Cir. 2008) ("An employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate.").

To the extent Williams is arguing that the Department should have found another assignment for her during the mornings, the ADA does not impose on the Department a requirement to "create a new position" for Williams during a time of day that bore no relation to her disability accommodation. Doe v. Major Model Mgmt. Inc., No. 11 Civ. 6182 (KBF), 2012 WL 763556, at *10 (S.D.N.Y. Mar. 9, 2012) (granting defendants' motion for summary judgment); see Graves I, 457 F.3d at 187 (the ADA "does not require creating a new position for a disabled employee"); Batlizde v. Harris Beach L.L.P., No. 05 Civ. 86 (DLC), 2008 WL 2009385, at *5 (S.D.N.Y. May 8, 2008) (granting summary judgment dismissing reasonable accommodation claim where plaintiff failed to offer evidence showing her requested position was available). She bears the burden of demonstrating, "at or around the time when accommodation was sought, [] an existing vacant position to which she could have been reassigned." McBride, 583 F.3d at 97–98. Williams has not done so here, and therefore has not met her prima facie burden. See Clark v. Jewish Childcare Ass'n, Inc., 96 F. Supp. 3d 237, 259 (S.D.N.Y. 2015) (granting summary judgment

dismissing reasonable accommodation claim where plaintiff failed to show that there was a vacant position for which she was qualified).

Accordingly, because Williams cannot point to any genuine issue of material fact showing that she requested and was denied a reasonable accommodation based on her disability in December 2016 or anytime thereafter, Defendants are entitled to summary judgment.

### 2. **Hostile work environment claim**

As set forth above, to establish a hostile work environment claim, Williams must show that (i) "the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of . . . her work environment," and (ii) the harassment was based on her disability. Harvin, 767 F. App'x at 128. (See supra Section III.A.4.).

### a. **"Sufficiently severe or pervasive"**

In order to show that harassment was "sufficiently severe or pervasive" to alter the conditions of her working environment, Williams must show not only that she perceived the conduct as abusive, but that a reasonable person would also find it hostile or abusive. Rasmy, 2020 WL 1069441, at *4; Rivera, 743 F.3d at 20; Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014).

Williams points to three instances in which, she believes, Geiger was hostile to her: (1) in September 2015, when she claims Geiger moved the records room to the basement "just to spite [her];" (2) during the 2015–2016 school year when Geiger yelled "fire drill" and criticized Williams for holding the door open for other staff; and (3) during the incident on December 19, 2016. (ECF Nos. 54-2 at 5, 7, 35; 60-1 at 8, 11, 15–16; 66 ¶ 40). Geiger was not Williams's immediate

supervisor (ECF No. 66 ¶ 8), and Williams does not contend that any other Department or High School employee was hostile to her, participated in, or encouraged Geiger's conduct.

Despite Williams's subjective belief that Geiger's treatment was hostile, the Court finds that no "reasonable employee would find the conditions of her employment <u>altered for the worse</u>." <u>Terry</u>, 336 F.3d at 148. The three incidents that Williams describes over a 15-month period are the kind of occasional, "[r]un-of-the-mill workplace conflicts" that "do not rise to the level of an objectively hostile workplace." <u>Harvin</u>, 767 F. App'x at 128; <u>Brennan</u>, 192 F.3d at 318 (explaining that "occasional episodes do not warrant relief"); <u>see</u> <u>Nugent</u>, 303 F. App'x at 944 (finding "derogatory language," "dismissive comments," "attempts to create a paper trail," and "intense scrutiny" were "insufficiently severe and pervasive" to survive summary judgment). Williams does not point to any evidence that Geiger's isolated comments prevented her from completing her assignments, whether in the records room, the guidance office, or elsewhere in the High School. <u>See</u> <u>Rasmy</u>, 2020 WL 1069441, at *14 (relevant factors in assessing hostile work environment include "whether [alleged misconduct] unreasonably interferes with the victim's [job] performance"). In addition, Geiger was not Williams's immediate supervisor, and Williams does not show that they interacted on a regular basis; that Williams may have had a "fraught" relationship with Geiger did not transform the work environment, as a whole, into a hostile one. <u>Harvin</u>, 767 F. App'x at 128; <u>see</u> <u>Harris</u>, 510 U.S. at 23 (requiring holistic view of working environment); <u>Rasmy</u>, 2020 WL 1069441, at *4 (same). Accordingly, from an objective point of view, the conduct that Williams has identified is insufficiently severe or pervasive to support a hostile work environment claim.

### b. **"Based on disability"**

Even if a reasonable juror could conclude that Geiger's conduct was sufficiently severe or pervasive, Williams offers no evidence to show that her disability or her request for a reasonable accommodation were the basis for Geiger's conduct.  See Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002) (holding that plaintiff asserting hostile work environment must link the hostile conduct to her protected class).  Rather, the undisputed evidence shows the opposite:  at all times, the Department granted and Geiger implemented the reasonable accommodations that Williams requested for her disability.  (See supra Section III.B.1.).  In addition, even after the incident on December 19, 2016, Geiger approved Williams's requests for leave for restoration of health, and the Department approved Williams's request for disability retirement.  (ECF No. 66 ¶¶ 49, 51, 53).  Finally, Williams has not even shown how a reasonable juror could conclude that any "[f]acially neutral incident" was in fact based on her disability.  Alfano, 294 F.3d at 378.  In short, the Court concludes that there is "simply no nexus between the alleged hostility and her disability."  Sosa v. N.Y. Div. of Human Rights, No. 11 Civ. 5155 (NGG) (VVP), 2015 WL 5191205, at *12 (E.D.N.Y. Sept. 4, 2015).  Therefore, Defendants are entitled to summary judgment on Williams's hostile environment claim.

### 3. **Constructive discharge claim**

As set forth above, a "constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'"  Pena v. Brattleboro Retreat, 702 F.3d 322, 325 (2d. Cir. 1983) (quoting Young v. Sw. Sav. & Loan Ass'n, 509 F.2d 140, 144 (5th Cir. 1975)).  The Second Circuit has recognized constructive discharge "when an employer deliberately makes

an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." Kader v. Paper Software, Inc., 111 F.3d 337, 339 (2d Cir. 1997) (internal citations omitted).

Here, the Department changed Williams's hours from the morning to the afternoon, which is the kind of "change in job responsibilities" that the Second Circuit has deemed insufficient to show the level of intolerability required to establish a constructive discharge claim. See Pena, 702 F.2d at 325–26. Williams's disagreement with the Department boiled down to a disagreement over the timing of her shifts, which "[n]o reasonable person would have found [to be] a compulsion to resign," particularly given that after December 2016, Geiger granted each of her requests for leave for restoration of health. Id. at 326 (holding that disagreement over timing of training was not constructive discharge). (See ECF No. 66 ¶¶ 49–51). See also Simon v. City of New York, No. 17 Civ. 9575 (DAB), 2019 WL 916767, at *8 (S.D.N.Y. Feb. 14, 2019) (finding that change in work schedule was "mere inconvenience" or "alteration of job responsibilities" that was not cognizable under ADA, NYSHRL and NYCHRL); Pacheco v. N.Y. Presbyterian Hosp., 593 F. Supp. 2d 599, 619 (S.D.N.Y. 2009) (collecting cases holding that shift in work hours by itself is not adverse employment action); see also Antonmarchi v. Consol. Edison Co., No. 03 Civ. 7735 (LTS) (KNF), 2008 WL 4444609, at *14 (S.D.N.Y. Sept. 29, 2008) ("Unfavorable hours do not constitute an adverse employment action for the purposes of Title VII.").

To the extent that Williams is claiming that her unpleasant interactions with Geiger on December 19, 2016 forced her to resign, it is well-settled that "not every unpleasant matter short of [discharge or demotion] creates a cause of action." Ongsiako v. City of New York, 199 F. Supp. 2d 180, 186–87 (S.D.N.Y. 2002) (internal citations omitted). Even accepting Williams's version of

events that Geiger became "very emotional" or displayed an angry demeanor towards her on three occasions, that behavior does not show any relationship between the change in Williams's schedule and her disability.  Cf. Doe, 2012 WL 763556, at *9 (finding that supervisor's angry demeanor did not show adverse employment action because of disability).

Finally, even if Williams believed that the schedule change ignored her disability accommodation, she did not avail herself of the Department's internal procedures to avoid ending her employment.  (See supra pp. 21–22).  See Early v. Wyeth Pharms., Inc., 603 F. Supp. 2d 556, 583 (S.D.N.Y. 2009) (recognizing cases holding that "the availability of alternative avenues to resignation, such as complaint procedures, may preclude a finding of constructive discharge"); Silverman v. City of New York, 126 F. Supp. 2d 108, 115 (E.D.N.Y. 2002) (recognizing courts that "refused to find a constructive discharge where an employee had an avenue through which [she] could seek redress for the allegedly intolerable work atmosphere . . . but failed to take advantage thereof").

Accordingly, the Court finds that Williams has failed to demonstrate a genuine issue of fact concerning her constructive discharge claim, and Defendants are entitled to summary judgment.

## C. Analysis of Williams's State and City Law Claims

Williams asserts against the Department claims for reasonable accommodation, hostile work environment, and constructive discharge under the NYSHRL, and claims for reasonable accommodation and constructive discharge under the NYCHRL.  (ECF No. 47 ¶¶ 39–66).  She asserts against Geiger aiding and abetting claims under both the NYSHRL and NYCHRL.  (Id. ¶¶ 67–80).

Under New York law, a plaintiff seeking to bring a claim against a school district or its officers that involves the rights or interests of the school district must file a written notice of claim on the governing board of the district within 90 days of the accrual of the claim. N.Y. Educ. L. § 3813(1); see United States v. N.Y.C. Dep't of Educ., No. 16 Civ. 4291 et al., 2017 WL 1169653, at *2 (S.D.N.Y. Mar. 28, 2017). A plaintiff must plead and prove that she has filed a timely notice of claim, or risk dismissal of the claim. See Moore v. City of New York, No. 08 Civ. 8879 (PGG), 2010 WL 742981, at *9 (S.D.N.Y. Mar. 2, 2010); Biggers v. Brookhaven-Comsewogue Union Free Sch. Dist., 127 F. Supp. 2d 452, 454 (S.D.N.Y. 2001). The notice of claim requirement does not apply to claims against administrators or other school employees. See Bacchus v. N.Y.C. Dep't of Educ., 137 F. Supp. 3d 214, 234 (E.D.N.Y. 2015).

### 1. **Williams's claims against the Department**

The events giving rise to Williams's claims arose on December 19, 2016, but Williams did not file her notice of claim until June 11, 2018, well past the 90-day deadline. (ECF No. 66 ¶¶ 60–61). Williams concedes that she failed to satisfy the notice of claim requirement with respect to her claims against the Department. (ECF No. 59 at 4). Accordingly, Williams's claims under the NYSHRL and NYCHRL against the Department are dismissed.

### 2. **Williams's claims against Geiger**

The notice of claim requirement does not apply to Williams's claims against Geiger. See Bacchus, 137 F. Supp. 3d at 234 (holding that requirements of section 3813 did not apply to claims against school principal). Because, however, the Court is dismissing all of the federal claims in this case, the Court has discretion to retain supplemental jurisdiction over any pendent state law claims. See 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal law claims are

eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims." Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanly Inv. Mgmt., Inc., 712 F.3d 705, 727 (2d Cir. 2013) (internal citations omitted); Tojzan v. N.Y. Presbyterian Hosp., No. 00 Civ. 6105 (WHP), 2003 WL 1738993, at *9 (S.D.N.Y. Mar. 31, 2003) (declining to retain jurisdiction over pendent NYSHRL claims after dismissing ADA claims).

Here, this action has not been pending in this Court for an unduly long period of time, and briefing of this motion was completed in October 2019. Cf. Chenensky v. N.Y. Life Ins. Co., 942 F. Supp. 2d 388, 393 (S.D.N.Y. 2013) (declining to exercise supplemental jurisdiction over state law claims in case that had been pending over five years). Although Williams's NYSHRL and NYCHRL claims arise from the same set of facts as her federal claims, "the legal frameworks under which a court must evaluate the state and city laws at issue diverge, often substantially, from those governing ADA claims." Hernandez, 2015 WL 321830, at *25. For example, the definition of "disability" is broader under both the NYSHRL and the NYSHRL than under the ADA, see id. (citing N.Y. Exec. L. ¶ 292(21) and N.Y.C. Code § 8-102(16)(a)), and while Defendants have conceded for purposes of this motion that Williams is disabled, they would have the right to dispute that legal issue should the state and city claims proceed. In addition, amendments enacted in 2005 require "broad construction" of the NYCHRL, such that "'courts must analyze NYCHRL claims separately and independently from any federal and state law claims.'" Id. (quoting Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013)).

In circumstances such as this, where Williams's state and city law claims require an analysis separate from her ADA claims, the Court's retention of jurisdiction will not significantly conserve judicial resources.  See Id. at *26.  Furthermore, the United States Supreme Court has cautioned courts to avoid "[n]eedless decisions of state law . . . as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966); see Williams, 2000 WL 33175735, at *21 (declining to exercise jurisdiction over state law claims where federal claims were dismissed).  Therefore, applying state and city law to the facts of Williams's claims would be "a question best left to the Courts of the State of New York."  Tojzan, 2003 WL 1738993, at *9.

Having considered the factors relevant to the exercise of pendent jurisdiction, the Court concludes that "the most appropriate course of action would be the Court to decline to exercise supplemental jurisdiction and to dismiss those claims, without prejudice to [Williams's] pursuing them, as appropriate, in state court."  Hernandez, 2015 WL 321830, at *26; see Concepcion, 2016 WL 386099, at *21 (declining to exercise jurisdiction over NYSHRL and HYCHRL claims where federal claims were dismissed); Uddin v. City of New York, No. 07 Civ. 1356 (PAC) (DF), 2009 WL 2496270, at *27 (S.D.N.Y. Aug. 13, 2009) (same).[2]

## IV. CONCLUSION

For the reasons set forth above,

(1)  Defendants' motion for summary judgment (ECF No. 51) is GRANTED;

---

[2] Under 28 U.S.C. § 1367(d), the statute of limitations to bring the state and city law claims in state could would be tolled for the period from the filing of Williams's original complaint to 30 days after the Court's dismissal of this action.  See Hernandez, 2015 WL 321830, at 26 n. 19.

(2)  Plaintiff's ADA claims (Counts I-III) are DISMISSED WITH PREJUDICE;

(3)  Plaintiff's NYSHRL and NYCHRL claims against the Department (Counts IV-VIII) are

DISMISSED WITH PREJUDICE; and

(4)  Plaintiff's NYSHRL and NYCHRL claims against Geiger (Counts IX-X) are DISMISSED

WITHOUT PREJUDICE.

The Clerk of the Court is respectfully directed to close ECF No. 51.


Dated:　　　New York, New York
　　　　　　March 19, 2020

SO ORDERED

_____
SARAH L. CAVE
United States Magistrate Judge